USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: __1/10/17__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LISA LEE,

                Plaintiff,

    -against-

AIR CANADA and JOHN DOE, True
Name Unknown,

                Defendants.

---

14-cv-10059 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

Plaintiff Lisa Lee has sued defendant Air Canada, seeking damages for injuries allegedly received on board a flight operated by defendant. Lee alleges that she was injured when a piece of luggage that a fellow passenger was attempting to place into an overhead compartment above plaintiff's seat fell and hit her on the head. This claim is governed by the Montreal Convention, which authorizes passengers to recover damages for injuries sustained in international flights.

Defendant Air Canada has now moved for summary judgment dismissing this action pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that the incident that caused Lee's alleged injuries was not an "accident" within the terms of the Montreal Convention and Air Canada is therefore not liable. Alternatively, Air Canada seeks judgment limiting its liability pursuant to Article 21 of the Montreal Convention. Lee has, for her part, moved for summary judgment in her favor on liability on the grounds that the incident was indeed an "accident" and therefore the carrier is liable.

Because this Court concludes that plaintiff's injuries were caused by an "accident," plaintiff's motion for summary judgment on liability is granted and Air Canada's motion for summary judgment on the issue of

liability is denied.   Air Canada's request for the alternative relief of judgment limiting its liability is granted.[1]

## I.   BACKGROUND

On May 13, 2013, plaintiff Lisa Lee boarded Air Canada flight AC703 at LaGuardia Airport in New York, bound for Toronto, Canada. Verified Complaint dated Oct. 31, 2014 ("Complaint") at ¶ 5, Ex. A in Notice of Removal, dated Dec. 22, 2014.  Lee was sitting in her assigned aisle seat when she was struck on the head by the carry-on roller bag of another passenger, Vadim Mezhibovski.[2]  Supp. Rule 56.1 Statement ¶¶ 9-10.  Mezhibovski's own assigned seat was five rows behind that of Lee.  *Id.* ¶¶ 3, 14.  After he had walked to his seat, he noticed that the overhead bin by his seat was full, *id.* ¶ 15, and decided to walk back toward where Lee was sitting, against the flow of other boarding passengers, "where he had noticed available overhead bin space," *id.* ¶ 18.  Mezhibovski found space for his bag above Lee's seat, *id.* ¶ 19, and as he lifted his bag to place it in the overhead bin, he was "bumped" or "struck" on the leg by a passenger – or that person's bag – who was "passing down the aisle."  *Id.* ¶ 20.  As a result, Mezhibovski "lost his balance" and dropped his bag, *id.* ¶ 21, which struck Lee "on her head and hand," *id.* ¶ 41.  After speaking with flight attendants, Lee decided to disembark the plane to seek medical help.  *Id.* ¶¶ 31-32.

At the time of the incident, Air Canada's flight attendants were "stationed throughout the cabin" and were "performing their assigned duties," including "greeting passengers, directing the passengers to their assigned seats and generally monitoring the cabin for safety."  *Id.* ¶ 24. There is no evidence that the flight crew made any announcement or

---

[1] Lee also asks the Court to deem the Complaint amended to assert her claims under the Montreal Convention instead of the Warsaw Convention.  Defendant has not objected to that request and the Court grants it; the Montreal Convention has superseded the Warsaw Convention in the United States.  *See Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004).

[2] After the commencement of this litigation, Vadim Mezhibovski was identified as the passenger who dropped the bag onto Lee.

warning concerning passenger flow during the boarding process. *Id.* ¶¶ 42, 47-48. One Air Canada flight attendant – Catalina Ramirez – saw Mezhibovski's bag fall but "could not prevent the bag from striking [Lee]," as she was five to eight rows away and "there were other passengers in the aisle." *Id.* ¶¶ 25, 27. Ramirez "immediately responded to the incident" by "check[ing] on" Lee to see if she was alright, *id.* ¶ 28, seeking ice for her, *id.* ¶ 29, and "immediately" notifying her supervisor, *id.* ¶ 30.

The parties do not dispute that Mezhibovski's bag was fully compliant with Air Canada's baggage policies, *id.* ¶ 17; that neither federal regulations nor Air Canada's policies required cabin crew members to help Mezhibovski place his bag into the overhead bin, *id.* ¶ 34, Report of Melanie G. Melton Wahrmund dated Feb. 23, 2016 ("Wahrmund Report"), at 10-11, Ex. J to Decl. of Andrew J. Harakas dated Apr. 22, 2016 ("Harakas Decl."); and that the number and positioning of the flight attendants on the flight was consistent with federal regulations and industry standards, Supp. Rule 56.1 Statement ¶¶ 7, 23.

## II. DISCUSSION

### A. The Summary Judgment Standard

Summary judgment is appropriate if there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). "Nonetheless, the party opposing summary judgment 'may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence' in support of its factual assertions." *Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 731 (S.D.N.Y. 2012) (citing *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"When considering cross-motions for summary judgment, a court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004) (internal quotations and citations omitted).

## B.   The Definition of an "Accident" Under the Montreal Convention

### 1.   *The Montreal Convention*

The parties agree that, because Lee's injuries occurred on board an aircraft in international carriage, Lee's claims are brought pursuant to the Montreal Convention of 1999,[3] which superseded the Warsaw Convention[4] in 2003. *See Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 371 n.4 (2d Cir. 2004).

When the Warsaw Convention was negotiated and enacted in the first half of the twentieth century, its "cardinal purpose" was to "achiev[e] uniformity of rules governing claims arising from international air transportation." *El Al Isr. Airlines, Ltd. v. Tseng*, 525 U.S. 155, 169 (1999). Since the Warsaw Convention was drafted while the airline industry was in its infancy, it sought to "limit the liability of air carriers in order to foster the growth" of that industry. *Ehrlich*, 360 F.3d at 371 n.4 (internal quotations and citations omitted).

Toward the end of the twentieth century, the state parties to the Warsaw Convention negotiated a treaty – the Montreal Convention – to replace the Warsaw Convention and its associated "hodgepodge of supplementary amendments and intercarrier agreements." *Ehrlich*, 360 F.3d at 371 n.4 (internal quotations and citations omitted). Unlike its predecessor, this new treaty clearly "favor[ed] passengers rather than

---

[3] The Montreal Convention is formally known as the Convention for the Unification of Certain Rules of International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106–45, 2242 U.N.T.S. 350.

[4] The Warsaw Convention is formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934).

airlines." *Id.* It eliminated the Warsaw system's "arbitrary caps" on air carrier liability and held carriers "strictly liable for the first 100,000 [Special Drawing Rights ("SDRs")[5]] of proven damages for each passenger . . . ." Letter of Submittal from Deputy Secretary Strobe Talbott, U.S. Dep't of State, June 23, 2000, *reprinted in* Message from the President of the U.S. Transmitting the Montreal Convention for the Unification of Certain Rules for International Carriage by Air Done at Montreal May 28, 1999 ("Transmittal Letter"), S. Treaty Doc. No. 106–45.

Despite the differences between their overarching purposes, the Montreal Convention retained a number of provisions that had been present in the Warsaw Convention. The most important of these, for present purposes, is Article 17, which provides:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Art. 17(1), Montreal Convention. In other words, once an incident is determined to be an "accident" that occurred on board the aircraft or in the course of embarking or disembarking, the carrier is strictly liable.

The state parties to the Montreal Convention understood that Article 17(1) was to be "construed consistently with the precedent developed under the Warsaw Convention and its related instruments," Article-by-Article Analysis of the Montreal Convention for the Unification of Certain Rules for International Carriage by Air Done at Montreal May 28, 1999, *reprinted in* Transmittal Letter, S. Treaty Doc. No. 106–45, and courts have followed this lead, *see Baah v. Virgin Atlantic Airways Ltd.*, 473 F. Supp. 2d 591, 596-97 (S.D.N.Y. 2007).

---

[5] An SDR is a unit of artificial currency which fluctuates based on the global currency market.

### 2. Defining an Article 17 "Accident"

Although the Montreal and Warsaw Conventions allow for an injured passenger to recover damages from an air carrier only in the event of an "accident," neither treaty defines the term. The United States Supreme Court filled this void in a 1985 case, *Air France v. Saks*, 470 U.S. 392, 405 (1985), by declaring clearly and unanimously that an "accident" arises "only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger." The *Saks* court directed the inferior courts to apply its definition both "flexibly" as well as "broadly," citing with approval the fact that "lower courts ... have interpreted Article 17 broadly enough to encompass torts committed by terrorists or fellow passengers." *Id.* The Supreme Court further emphasized the breadth of its definition by explaining that "[a]ny injury is the product of a chain of causes, and we require *only* that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 406 (emphasis added).

Nonetheless, the broad definition crafted by the Supreme Court does not mean that every injury that occurs on an airplane is the result of an "accident." In fact, in the specific incident under review in *Saks*, the court found that no "accident" had occurred as a matter of law because a passenger's deafness – allegedly caused by "the negligent maintenance and operation of the jetliner's pressurization system," *id.* at 394 – was not an unexpected, external event and instead "indisputably result[ed] from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Id.* at 406.

#### a. Differing district court interpretations of the Saks definition

The Supreme Court's definition of "accident" requires an inquiry only into whether the injury-causing event was an unexpected or unusual event external to the passenger. However, as both Lee and Air Canada acknowledge, many lower courts have been reluctant to apply the *Saks* definition to cases where there was no clear causal connection between the acts or omissions of the air carrier or its crew and the injury-causing event. These courts have encrusted two glosses onto the Supreme Court's definition of what constitutes an "accident."

6

One such barnacle is to require the "accident" to arise from the risks peculiar to or characteristic of air travel. Courts adopting this view note that when the "the drafters of the Warsaw Convention" were devising a system to protect the airline industry, they did not have "in mind" torts unrelated to risks attendant to air travel. *Curley v. Am. Airlines, Inc.*, 846 F. Supp. 280, 283 (S.D.N.Y. 1994); *see also Price v. British Airways*, No. 91 Civ. 4947, 1992 WL 170679, at *3 (S.D.N.Y. July 7, 1992) (no "accident" where injury was caused by a fist-fight with another passenger because "a fracas is not a characteristic risk of air travel"). This approach has been criticized for, among other things, burdening courts with a "complicated, always fact laden, and irrelevant question of what constitutes a risk characteristic of air travel." *Wallace v. Korean Air*, 214 F.3d 293, 300-01 (2d Cir. 2000) (Pooler, J., concurring); *see also Girard v. Am. Airlines, Inc.*, No. 00-CV-4559, 2003 WL 21989978, at *5-*6 (E.D.N.Y. Aug. 21, 2003); *Barratt v. Trin. & Tobago (BWIA Int'l) Airways Corp.*, No. CV 88-3945, 1990 WL 127590, at *2 (E.D.N.Y. Aug. 28, 1990).

A slightly different approach district courts have used to narrow the definition of "accident" requires that the event in question bear some relation to the operation of the aircraft. *See Levy v. Am. Airlines*, No. 90 Civ. 7005, 1993 WL 205857, at *4 (S.D.N.Y. June 9, 1993) (no "accident" where passenger was allegedly assaulted by federal agents during the flight because their "conduct was in response to [plaintiff's] actions and was completely independent of the operation of the flight").[6] For example, the district judges in *Fulop v. Malev Hungarian Airlines*, 175 F. Supp. 2d 651, 661 (S.D.N.Y. 2001) and *Girard*, 2003 WL 21989978 at *6-*7, *8, concluded that,

---

[6] This is the prevailing view in the First Circuit, where courts have required the event in question to relate to "some malfunction or abnormality in the aircraft's operation." *Gotz v. Delta Air Lines, Inc.*, 12 F. Supp. 2d 199, 201-02, 203 (D. Mass. 1998) (no "accident" occurred where passenger placing bag into overhead compartment was injured avoiding an aisle passenger who had suddenly decided to stand up because "the passenger's rise from his seat ... bears no relation to the operation of the aircraft"); *see also Langadinos v. Am. Airlines, Inc.*, 199 F.3d 68, 70-71 (1st Cir. 2000); *Goodwin v. British Airways PLC*, Cv. No. 09-10463, 2011 WL 3475420, at *4-*7 (D. Mass. Aug. 8, 2011); *Garcia Ramos v. Transmeridian Airlines, Inc.*, 385 F. Supp. 2d 137, 142-43 (D.P.R. 2005).

in order for an incident to qualify as an "accident" within the intendment of the Montreal Convention, there had to be "some causal relationship" between the event and "the operation of the aircraft or the conduct of the carrier's employees." *Fulop* and *Girard* found that this causal link could be satisfied by "any act of judgment, exercise of control or application of carrier operation that, regardless of fault, implicated the airline in some abnormal, unusual or unexpected role as a causal agent of the injury." *Girard*, 2003 WL 21989978 at *9 (quoting *Fulop*, 175 F. Supp. 2d at 663). The *Fulop* and *Girard* courts went on to determine that a plaintiff could also show that the "accident" arose from a risk "reasonably associated with aviation which, if known, the carrier could reasonably assume and insure against." *Id.* (quoting *Fulop*, 175 F. Supp. 2d at 663).

At the same time, other district courts have simply applied the broad *Saks* definition of "accident," even where there was no clear causal connection between the conduct of the flight crew and the injury-causing event. In *Lahey v. Sing. Airlines, Ltd.*, 115 F. Supp. 2d 464, 467 (S.D.N.Y. 2000), for example, the district court found that an "accident" occurred when a fellow passenger threw a tray of food at the plaintiff because this incident was "certainly 'unexpected and unusual' and 'external'" to the plaintiff. The court stressed that "the actions of the crew [we]re not relevant to the determination of whether the assault was an 'accident.'" *Id.* at 467; *see also Kwon v. Sing. Airlines*, 356 F. Supp. 2d 1041, 1046 (N.D. Cal. 2003) ("accident" occurred when passenger lost her balance and stepped on another passenger's foot while trying to load her luggage into an overhead bin); *Wipranik v. Air Can.*, No. CV 06-3763, 2007 WL 2441066, at *4 n.1, *5 (C.D. Cal. May 15, 2007) (rejecting any requirement that the cause of the injury be a result of "a malfunction or abnormality in the aircraft's operation" and finding that an "accident" occurred when movement in the seat in front of plaintiff caused her cup of hot tea to slide off the tray).

### b.    *Controlling authority*

There is no controlling authority requiring this Court to apply either of the approaches employed by district courts to limit what can constitute an "accident." In fact, in its most recent decision on the

definition of an Article 17 "accident," the Supreme Court reminded courts that the *operative language* under *Saks* and the *correct Article 17 analysis*" is the determination of whether the injury-causing event or conduct was "unexpected and unusual."  *Olympic Airways v. Husain*, 540 U.S. 644, 657 (2004) (emphasis added).

The Second Circuit has declined to hold that the *Saks* definition of an Article 17 'accident' needs to be narrowed in any way, whether by requiring the incident to arise from risks characteristic of air travel or by requiring it to bear any relation to the operation of the aircraft.  In *Wallace v. Korean Air*, 214 F.3d 293 (2d Cir. 2000), *cert. denied*, 531 U.S. 1144 (2001), a panel of the Second Circuit did not need to address the issue because it determined that, even under the narrower interpretation, an "accident" *had* occurred when a male passenger sexually assaulted a neighboring female passenger by unzipping and reaching into her pants.  The court concluded that the "characteristics of air travel increased [the plaintiff's] vulnerability to the . . . assault" because she was "cramped into a confined space beside two men she did not know, one of whom turned out to be a sexual predator" who was "left unsupervised in the dark."  *Id.* at 299.  The court also alluded to the causal link between the "accident" and the operation of the flight:  even though the victim was sitting in a window seat, in the dark, and there was no indication that the flight crew was in a position to have seen or anticipated the assault, the court commented that the offender was able to carry out the assault without "a single flight attendant notic[ing] a problem."[7]  *Id.* at 300.

The Second Circuit had another opportunity to clarify the parameters of an Article 17 "accident" in *Magan v. Lufthansa German*

_____

[7] Because "[t]he opinions of sister signatories, as reflected in their judicial decisions, are entitled to considerable weight" for the interpretation of terms appearing in international treaties, *Saks*, 470 U.S. at 404 (internal quotations and citations omitted), it is worth noting that in *Morris v. KLM Royal Dutch Airlines*, [2001] EWCA Civ. 790, 2001 WL 483072 (May 17, 2001), the Court of Appeal of England and Wales similarly found that a minor plaintiff who was groped by a neighboring passenger had been injured in an Article 17 "accident."  The court, in dicta, commented that "[t]here is nothing in *Saks* that justifies the requirement that an 'accident' must have some relationship with the operation of the aircraft or carriage by air."  *Id.* ¶ 25.

*Airlines,* 339 F.3d 158 (2d Cir. 2003).  In that case, the court observed in a footnote that it would be "helpful" to keep in mind the principle of "apportionment of risk to the party best able to control it" when determining whether an incident in any particular fact pattern is an "accident." *Id.* at 162 n.3.  The court explained that the apportionment of risk principle "provides some degree of certainty and predictability to passengers and air carriers, and . . . encourages them to take steps to minimize that risk to the degree that it is within their control."[8]  *Id.* Notably, the court cited *Fulop* for this proposition but did not expressly endorse its conclusion that the airline must be causally involved in any "accident." *Id.*

### 3.  *This Incident*

Courts have consistently found that items falling from overhead compartments are both "unexpected and unusual" and "external" to the unfortunate passenger upon whom the items land.  *See Maxwell v. Aer Lingus Ltd.,* 122 F. Supp. 2d 210, 213 (D. Mass. 2000); *Smith v. Am. Airlines, Inc.,* No. C 09-02903, 2009 WL 3072449, at *5 (N.D. Cal. Sept. 22, 2009) ("The bottle falling from above was both 'unexpected and unusual,' it was an event that was 'external' to plaintiff's body, and it caused plaintiff bodily harm.  Thus, the requirements of *Saks* . . . are satisfied.").

Here, Air Canada does not dispute that a bag falling on Lee was an external event that was unexpected and unusual; rather, it urges this Court to introduce a causal requirement to *Saks* to conclude that no Article 17 "accident" occurred in this case.

Air Canada distinguishes this case from *Smith* and *Maxwell* by pointing out that in both of those cases, where accidents were determined to have occurred, objects fell from overhead bins only *after* the flight crew's responsibility to secure the items in those bins had been triggered.  *See*

---

[8] Earlier, in *Wallace,* the Second Circuit explained that a consideration of distribution of risk principles also explains why a system of "virtual strict liability" is sensible in aviation:  "the carrier would seem, in nearly every case, to be in the best position to . . . spread the risk most economically regardless of fault."  214 F.3d at 297 (internal quotations and citations omitted).

*Maxwell*, 122 F. Supp. 2d at 212-13; *Smith*, 2009 WL 3072449 at *5. By contrast, according to Air Canada, Lee's injuries were brought about without any causal involvement from the carrier. Air Canada insists that its crew was not responsible for supervising each passenger's stowing of bags during the boarding process and that the crew was not in a position to prevent Mezhibovski from dropping his bag onto Lee. Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Br."), 13-14; Def.'s Reply Mem. Opp. Pl.'s Mot. Summ. J. & Supp. Def.'s Mot. Summ. J. ("Def.'s Reply Br."), 6.

This Court is not persuaded that the Montreal Convention, *Saks*, or the case law of the Second Circuit requires that there be a causal connection between the injury-causing event and the operation of the aircraft or behavior of the flight crew in order to establish that an Article 17 "accident" took place and declines to encrust that requirement onto *Saks*. In any event, *Wallace* shows that even if a causal link were to be required, it could be satisfied in situations where the flight crew has no "knowledge [of] or direct complicity [in]" the incident and where its causal role is "attenuated and indirect." *Fulop*, 175 F. Supp. 2d at 669 (interpreting *Wallace*, 214 F.3d at 299).

In *Wallace*, the Second Circuit found that the plaintiff's sexual assault arose from risks characteristic of air travel because she was forced to sit in the dark and in close proximity to strangers. *Wallace*, 214 F.3d at 299. Here, it is similarly significant that Lee was sitting in an aisle seat when she was hit by a bag falling from above. It is a characteristic of air travel that passengers must store their bags in overhead storage facilities that are located directly above the heads of passengers seated in the aisle seats, thereby putting the seated passengers at risk of being struck by objects falling from above.

The *Wallace* decision also suggested that the operations of the air carrier were implicated by the fact that the plaintiff's assault must have taken more than a few seconds and therefore could have been noticed – and presumably cut short – by the crew. *Id.* at 300. Here, the parties do not dispute that "cabin crew members were stationed throughout the cabin" during boarding and that their duties included "generally monitoring the cabin for safety." Supp. Rule 56.1 Statement ¶ 24. In

addition, unlike the assault in *Wallace*, this incident *was* witnessed by at least one flight attendant as it happened, although the parties agree that this flight attendant was too far from the scene to prevent the bag from striking Lee. *Id.* ¶ 27. The court in *Wallace* never found that the assault at issue could have been wholly prevented, either – only that a flight attendant could have potentially stopped it after it had already begun.

To the extent that it can be "helpful" to keep in mind principles of "apportionment of risk" when determining whether an incident can qualify as an "accident," *Magan*, 339 F.3d at 162 n.3, Air Canada was certainly in a better position than Lee to detect and control any risk of bags falling on her from overhead compartments: the airline's own policies and procedures required the crew to supervise the boarding process for safety, *see* Supp. Rule 56.1 Statement ¶ 24. Irrespective of whether it was necessary or reasonable to do so under the circumstances, the crew could have minimized the risk of Mezhibovski dropping his bag onto Lee by taking actions such as warning passengers to take care when passing one another in the aisle and in placing their bags overhead. Put another way, the crew did have a "practical ability to influence" the circumstances which brought about the injury-causing event. *Fulop*, 175 F. Supp. 2d at 657 (noting that courts can find evidence of airline involvement when the circumstances of the injury-causing event "fall within the causal purview or control of the carrier – or at least within its practical ability to influence – as an aspect of the operations of the aircraft or airline").

Because another passenger's bag falling onto an unsuspecting passenger's head was an unexpected or unusual event that was external to her – and in light of the Supreme Court's instruction that courts apply its definition of "accident" both "broadly" and "flexibly" – this Court finds that the circumstances in this case constitute an "accident" pursuant to Article 17 of the Montreal Convention. Therefore, plaintiff's motion for summary judgment on liability is granted and defendant's motion for summary judgment is denied to the extent it sought judgment dismissing the action.

### C. Limitation on Plaintiff's Damages

The mere fact that an Article 17 "accident" occurred does not entitle a plaintiff to recover all provable damages. Pursuant to Article 21 of the Montreal Convention, an airline is not liable for damages exceeding 100,000 SDRs if the carrier proves that "such damage was not due to the negligence or other wrongful act or omission of the carrier or its servants or agents" or "such damage was solely due to the negligence or other wrongful act or omission of a third party." Art. 21(2), Montreal Convention. Today, the cap on an airline's "strict liability" is actually 113,100 SDRs (approximately $150,000) because of adjustments for inflation.[9]

In its motion for summary judgment, Air Canada seeks to cap its liability at 113,100 SDRs on the grounds that it was not negligent as a matter of law – or that only Mezhibovski and/or the passenger who bumped into him was negligent – in bringing about Lee's injuries. Instead of applying common law standards of negligence, Air Canada contends that the Court should consider only whether it complied with specific federal regulations addressing flight attendant responsibilities in the boarding process and the "overarching federal standard of care," that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another." 14 C.F.R. § 91.13(a). To reach this conclusion, Air Canada contends that local common law standards of negligence are preempted either through the Airline Deregulation Act of 1978 ("ADA") or the Federal Aviation Act ("FAA").

---

[9] *See* Dep't of Transp., Inflation Adjustments to Liability Limits Governed by the Montreal Convention Effective Dec. 30, 2009, 74 Fed. Reg. 59,017 (Nov. 16, 2009). Pursuant to Article 23(1) of the Montreal Convention, the value of an SDR is converted into dollars "at the date of the judgment" in accordance with the "method of valuation applied by the International Monetary Fund." On January 10, 2017 – the date of this Opinion & Order – the International Monetary Fund valued the SDR at approximately $1.35 U.S. dollars, so 113,100 SDRs was valued at approximately $152,685 U.S. dollars. *See* INTERNATIONAL MONETARY FUND, *SDR Valuation*, http://www.imf.org/external/np/fin/data/rms_sdrv.aspx (last visited Jan. 10, 2017).

In response, Lee contends that common law standards of negligence apply and that she has provided sufficient evidence for a reasonable jury to make a finding that Air Canada was negligent under those standards.

This Court finds that Air Canada was not negligent as a matter of law even pursuant to the New York common law negligence standard.[10] Because the result would be no different if the federal standard of care advocated by defendants preempted the state's standards, this Court does not find it necessary to undertake a preemption analysis.[11]

### 1. *Negligence*

For a defendant airline to demonstrate that it was *not* negligent, it can show that it had no duty to the plaintiff, that it did not breach any duty that *did* exist, or that the injury suffered by the plaintiff was not proximately caused by any breach made by the defendant. *See Di Benedetto v. Pan Am. World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004). In general, a jury should decide whether a defendant airline breached a duty of care. *Id.* However, "[o]nly in those cases where there arises a real question as to [a defendant's] negligence should the jury be permitted to proceed." *Id.* (quotation marks and citation omitted).

In New York, it is well settled that airlines owe a duty of "ordinary care commensurate with the existing circumstances" to their passengers. *Plagianos v. Am. Airlines, Inc.*, 912 F.2d 57, 59 (2d Cir. 1990) (citing *Crosland v. N.Y.C. Transit Auth.*, 68 N.Y.2d 165, 168 (1986) (internal quotation marks omitted)).

---

[10] Both parties agree that if federal law does not apply, the applicable law is that of New York – the state in which the incident took place.

[11] Since Air Canada exercised "ordinary care under the circumstances," it could not have acted "in a careless or reckless manner." 14 C.F.R. § 91.13(a). Nor has plaintiff pointed to any specific FAA regulations violated by Air Canada.

### 2. *This Incident*

Plaintiff's Complaint is premised upon a treaty violation and does not contain any specific allegations of negligence.   Nevertheless, her submissions on the cross-motions for summary judgment do allege that Air Canada's crew members acted negligently when they "did nothing to supervise and monitor the boarding process, other than assist passengers in stowing luggage, only upon request." Pl.'s Mem. Supp. Mot. Summ. J. & Opp. Def.'s Mot. Summ. J. ("Pl.'s Br."), 15.   The Court reads plaintiff's submissions to allege the following specific theories of negligence: (1) failure to assist Mezhibovski in stowing his bag, Pl.'s Br. 16; Pl.'s Reply Mem. Supp. Mot. Summ. J. & Opp. Def.'s Mot. Summ. J. ("Pl.'s Reply Br."), 14; (2) failure to instruct passengers about the need to take care in stowing bags in the overhead bins, Pl.'s Br. 16; (3) failure to prevent Mezhibovski from moving against the flow of other passengers, Pl.'s Br. 16; Pl.'s Reply Br. 14; and (4) failure to generally manage passenger flow in the aisle, Pl.'s Br. 16.

Air Canada has marshalled concrete evidence to show why none of these omissions amounts to a breach of its duty to exercise ordinary care under the circumstances.   Moreover, plaintiff has not put forth any "hard evidence in support of its factual assertions" to raise a "genuine dispute of material fact." *Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 731 (S.D.N.Y. 2012) (internal quotations and citations omitted).

With respect to plaintiff's first theory, Air Canada has shown that federal regulations, industry standards, and Air Canada policies all state that flight attendants must assist passengers with stowing their bags only when requested or where the passengers have apparent physical limitations. *See* Supp. Rule 56.1 Statement ¶¶ 34, 36. Mezhibovski was not disabled and never asked for assistance from Air Canada. *Id.* ¶ 22. His carry-on bag was fully compliant with Air Canada's baggage policy, *id.* ¶ 17, and there is no indication that he "was struggling to lift the bag," *id.* ¶ 37, *see also* Dep. of Lisa Lee dated June 26, 2015 at 105:10-13, Ex. A to Harakas Decl.   *Cf. Allen v. Delta Airlines, Inc.*, CV-01-0069, 2003 WL 21672746, at *3 (E.D.N.Y. July 3, 2003) ("In cases where injury resulted from baggage falling from overhead compartments, courts applying New

York law have generally denied summary judgment to airline defendants when there is evidence that the luggage in question was unusual or inappropriate for storage in the overhead compartment."); *Brosnahan v. Western Airlines, Inc.*, 892 F.2d 730, 734 (8th Cir. 1989) (noting that a reasonable jury *could* find that crew was negligent where no flight attendant stepped in to help a passenger who was making a "commotion" by "struggling with his luggage for at least thirty seconds").

Air Canada also provided uncontested expert testimony that it would not have been reasonable – or even possible – to assist every single passenger, especially given the flight attendants' responsibility to monitor the entire cabin. Supp. Rule 56.1 Statement ¶¶ 46, 63; *accord Ahmadi v. United Continental Holdings, Inc.*, No. 1:14-cv-00264, 2015 WL 4730116, at *5 (E.D. Cal. Aug. 10, 2015).

Plaintiff has failed to offer *any* evidence that Air Canada's flight attendants should have assisted Mezhibovski under these circumstances. Plaintiff does point out that one member of the crew was aware that Mezhibovski was looking for space in the overhead bins,[12] Supp. Rule 56.1 Statement ¶ 45, and that the flight attendants' duties during boarding include "help[ing] passengers find room" for their luggage, *id.* ¶ 46. But this says nothing about whether flight attendants needed to help *every* passenger or why Mezhibovski would have merited special treatment. In fact, plaintiff acknowledges that the flight attendant who was closest to Mezhibovski was not able to assist him because she was busy helping another passenger stow her own luggage at the time of the incident. *Id.* ¶ 25.

With respect to the second theory of negligence – that Air Canada failed to warn passengers about the need to take care in stowing bags in the overhead bins – Air Canada has shown that its crew performed all duties and made all announcements required by the applicable regulations, industry regulations, and airline policies. *Id.* ¶ 38. Aside from the conjecture that Air Canada could have made a novel warning, plaintiff

---

[12] This fact is disputed but the Court draws the inference in favor of plaintiff, the non-moving party.

has not produced any specific evidence to show why the existing standards are inadequate. In fact, plaintiff provides no evidence that a warning would have had any impact in this case; Mezhibovski did not act improperly when he lifted his bag into the overhead bin; he dropped the bag only because he was unexpectedly struck by someone passing by him in the aisle. *Id.* ¶¶ 10, 20.

The third potential theory of negligence in this case is that Air Canada failed to stop Mezhibovski from moving against the flow of oncoming passengers. Air Canada has shown that warning passengers going in opposite directions is neither required by federal regulations nor customary in the industry. *Id.* ¶ 47; Decl. of Melanie G. Melton Wahrmund dated May 20, 2016 ("Wahrmund Decl."), ¶ 4. In addition, there is no evidence that Mezhibovski was moving against the flow of passengers when he lifted his bag into the overhead bin.

The final theory offered by plaintiff is that Air Canada breached its duty of ordinary care by failing to manage passenger flow in the aisles. Air Canada established that it did not neglect to make any standard announcements with respect to passenger flow, Supp. Rule 56.1 Statement ¶ 61, and its expert declared that the mere fact that passengers pass one another in the aisle does not warrant flight attendant intervention, Wahrmund Decl. ¶ 5. Neither Lee nor Mezhibovski observed anything abnormal about the boarding process. Supp. Rule 56.1 Statement ¶ 55. In fact, the undisputed evidence shows that the airplane was boarded at below seventy-five percent capacity and that the aisle was not particularly crowded at the time of the incident. *Id.* ¶¶ 6, 59; *see also* Dep. of Vadim Mezhibovski dated Mar. 3, 2016 at 46:15-19, Ex. F of Harakas Decl.

Plaintiff asserts in her summary judgment briefing that the airline *could have* made an announcement instructing passengers not to pass one another in the aisle. Pl.'s Br. 13, 16. But in cases where plaintiffs *have* survived summary judgment by pointing out ways to improve protocol, they relied upon testimony from experts or other types of factual evidence to show that the existing standards were inadequate or that potential improvements were possible or practicable. For example, in *Andrews v. United Airlines, Inc.,* 24 F.3d 39, 40-41 (9th Cir. 1994), the plaintiff

successfully argued that summary judgment against her was precluded because an airline did not satisfy its duty to protect passengers from falling baggage as a matter of law. The plaintiff in *Andrews* presented testimony of both an airline employee who testified about the airline's awareness of the extent of the problem and a safety expert who testified about additional steps that the airline could have taken to prevent common injuries. *Id.* Even with this evidence, the Ninth Circuit, in an opinion by Judge Kozinski, found that it was a "close question" as to whether the plaintiff made a "sufficient case to overcome summary judgment." *Id.* at 41; *see also Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 472-73 (2d Cir. 1995). Here, no evidentiary support at all was presented to support Lee's proposed new warnings.

Having considered the evidence in this record and drawn all appropriate inferences, the Court finds that Air Canada has shown that as a matter of law it exercised reasonable care under the circumstances and that plaintiff has not produced any evidence to show that there is a genuine issue for trial. This record, "taken as a whole," cannot "lead a rational trier of fact to find for [Lee]." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Because Air Canada has established that it was not negligent as a matter of law,[13] its liability is limited to 113,100 SDRs of provable damages. Thus, its motion for summary judgment on the issue of limitation of liability is granted and plaintiff's recovery is limited to 113,100 SDRs of provable damages.

Accordingly, Air Canada's motion for summary judgment is denied to the extent it seeks judgment dismissing the action and is granted to the extent that judgment shall enter limiting Air Canada's liability to 113,100 SDRs pursuant to Article 21 of the Montreal Convention. Lee's motion for summary judgment is granted to the extent it (1) seeks judgment in her

---

[13] Because this Court finds that Air Canada successfully established that it was not negligent under Article 21(a) of the Montreal Convention, it is not necessary to analyze whether Air Canada has proven that plaintiff's injuries were caused "solely due to the negligence or other wrongful act or omission of a third party" pursuant to Article 21(b).

favor on liability; (2) seeks to amend the Complaint to assert her claims under the Montreal Convention rather than the Warsaw Convention; and (3) is otherwise denied.

Dated:  New York, New York
        January 10, 2017

SO ORDERED:

Sidney H. Stein, U.S.D.J.